**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**


YVETTE SMITH,

        **Plaintiff,**

v.                                     **Case No.  8:04-cv-1924-T-23TBM**

THE HOME DEPOT WELFARE
BENEFITS PLAN,

        **Defendant.**
_____/


### REPORT AND RECOMMENDATION

      THIS MATTER is before the court on referral by the Honorable Steven D. Merryday

for a Report and Recommendation on **Plaintiff's Motion for Summary Judgment** (Doc. 16),

**Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law**

(Doc. 25), and the parties' respective responses (Docs. 27, 28).  By their cross-motions, the

parties each seek summary judgment as to Plaintiff's Complaint (Doc. 1-1) for the recovery of

benefits, enforcement of rights, and clarification of rights to future benefits under a plan

governed by the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA" or

"the Act"), 29 U.S.C. §§ 1001-1381.  Metropolitan Life Insurance Company filed affidavits

and accompanying exhibits in support of its motion (Docs. 20, 21, 22, 23, 24, 36).  Oral

argument on the motions was heard on November 10, 2005.[1]

_____

     [1]The hearing was originally calendared as a Pretrial Conference.  The Pretrial
Conference will be rescheduled if necessary following the court's disposition of the cross-
motions for summary judgment.

I.

The undisputed facts establish that Plaintiff Yvette Smith was employed at relevant times by Home Depot U.S.A., Inc. (hereinafter "Home Depot") as a night crew/shelf stocker. As an employee of Home Depot, she was provided the option to purchase long-term disability benefits.  Plaintiff exercised this option and was covered by The Home Depot Welfare Benefits Plan (hereinafter "the Plan").

Plaintiff sustained injuries in an automobile accident on December 4, 2001.  After the accident, Plaintiff's symptoms included chronic neck pain, stiffness, headaches, upper back pain, bilateral shoulder pain, and intermittent pain and numbness in her left upper extremity. Plaintiff was treated or examined by numerous doctors, including a neurosurgeon and an orthopedic spine surgeon.

Plaintiff made a claim for disability insurance benefits pursuant to the Plan.  It is undisputed that Plaintiff's claim is based on a herniated disc with associated myofascial pain in her cervical spine.  See (Doc. 25 at 12-13).  The Plan's claims administrator and insurer, Metropolitan Life Insurance Company (hereinafter "MetLife"), initially approved her claim for short-term disability benefits for the period from December 4, 2001, through June 12, 2002. MetLife then approved her claim for long-term disability benefits through December 12, 2003.

By letter to Plaintiff dated October 31, 2003, MetLife advised that Plaintiff's benefits would be terminated as of December 12, 2003, and her benefits were denied beyond that date. See (Doc. 23-3).  In explanation, MetLife indicated that Plaintiff's primary diagnosis preventing her from working was cervical disc displacement, which fell under the soft tissue disorder limitation in the Plan.  By this limitation, Plaintiff's period of disability was limited to twenty-four months absent objective evidence of seropositive arthritis; spinal tumors,

2

malignancy, or vascular malformations; radiculopathies; myelopathies, traumatic spinal cord

necrosis; or musculopathies.  See id.  The letter advised Plaintiff of her right to appeal the

decision to MetLife and asked her to supply a written request for review of her claim setting

forth the reasons she disagreed with the denial of benefits, copies of all test results, and copies

of all medical records that would support objective evidence of the exceptions to the soft

tissue disorder limitation.  See id.

        By letter dated December 3, 2003, Plaintiff's attorney, William L. Moore, appealed

MetLife's decision and requested a continuation of long-term disability benefits.  See (Doc.

23-4 at 2).  Citing to an MRI and reports of Dr. Thomas Tolli, Dr. Frank Gomes, and Dr.

Eduardo Martinez, counsel argued that the objective evidence demonstrated that Plaintiff

suffers from cervical radiculopathy, one of the enumerated criteria for extending her benefits

beyond twenty-four months.  See id. at 3.

        On January 15, 2004, MetLife advised that it had completed its review of Plaintiff's

claim and denied her appeal for a continuation of benefits.  See (Doc. 24-2).  Metlife advised

that it reviewed Plaintiff's claim with a consulting doctor who was board certified in general

surgery and internal medicine, who noted that while Plaintiff's MRI revealed a disc

protrusion, it did not indicate the consequences of the protrusion and demonstrated normal

signal intensity in the spinal cord.  See id. at2.  Metlife acknowledged Dr. Martinez's note of

cervical radiculopathy but countered that it did not receive any current electromyogram or

nerve conduction studies for objective evidence.  See id.  MetLife cited to the October 14,

2002, neurological examination by Dr. William Greenberg, who noted that Plaintiff did not

have objective abnormalities to correlate with the abnormalities on the cervical MRI and that

there was no objective evidence of myelopathy or radiculopathy.  See id.  By this letter,

3

MetLife advised Plaintiff that she had exhausted her administrative remedies under the Plan and advised her of her right to bring a civil action under ERISA.

On August 23, 2004, Plaintiff filed the instant Complaint (Doc. 1-1) pursuant to section 502(a) of ERISA, 29 U.S.C. § 1132(a)(1)(B).[2]  By this action, Plaintiff seeks a recovery of benefits under the Plan, enforcement of Plaintiff's rights under the Plan, clarification of Plaintiff's rights to future benefits under the Plan, and an award of attorney's fees and costs.

Plaintiff filed a motion for summary judgment (Doc. 16) arguing that the soft tissue limitation is ambiguous and should be construed in Plaintiff's favor.  Alternatively, Plaintiff argues that even if the limitation is not ambiguous, the exceptions to the limitation apply in Plaintiff's favor.  As such, Plaintiff argues that Defendant's claims decision was wrong and in any event, not entitled to deference.

Defendant filed a cross-motion for summary judgment (Doc. 25) and a response to Plaintiff's motion (Doc. 27).  By these pleadings, MetLife argues that its decision to terminate benefits based on the soft tissue disorder limitation was legally correct because the terms of the Plan were unambiguous and properly applied to Plaintiff.  MetLife argues that even if the decision was not correct, the decision was reasonable and should be upheld under an arbitrary

---

[2]The proper party defendant in an action for ERISA benefits is the party that controls the administration of the plan. Hamilton v. Allen-Bradley Co., 244 F.3d 819, 824 (11th Cir. 2001) (citing Rosen v. TRW, Inc., 979 F.2d 191, 193-94 (11th Cir. 1992)); Garren v. John Hancock Mut. Life Ins. Co., 114 F.3d 186, 187 (11th Cir. 1997) (citations omitted).  MetLife does not, however, argue this as a grounds for summary judgment. At the November 10, 2005, hearing, MetLife's counsel indicated that it would not seek relief from an adverse ruling on the grounds that it was not named as the party defendant.

and capricious standard of review or heightened arbitrary and capricious standard.  MetLife

also seeks an award of attorney's fees and costs.

By her response (Doc. 25) in opposition to Defendant's motion, Plaintiff urges that

MetLife's wrong decision cannot be saved by a deferential standard of review.  By Plaintiff's

argument, the medical evidence and the claims examiner's notes indicate that Plaintiff is

unable to return to work.  Finally, she reiterates that the plan limitation is ambiguous and

should be resolved in her favor, and her medical condition meets one or more exceptions to

the plan's limitation.

II.

"[I]n an ERISA benefit denial case . . . the district court sits more as an appellate

tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the

reasonableness of an administrative determination in light of the record compiled before the

plan fiduciary."  Curran v. Abbott Labs. Extended Disability Plan, No. 04-14097, 2005 WL

894840 (11th Cir. Mar. 16, 2005) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st

Cir. 2002)).  Nevertheless, the legal standard for entertaining summary judgment motions in

cases involving a claim for benefits governed by ERISA is substantially the same as with

other such motions:

> In making this inquiry, "[w]e view all evidence and factual
> inferences reasonably drawn from the evidence in the light
> most favorable to the non-moving party." *See Burton v.*
> *Tampa Hous. Auth.,* 271 F.3d 1274, 1277 (11th Cir. 2001).
> Summary judgment is appropriate "if the pleadings,
> depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving
> party is entitled to a judgment as a matter of law." Fed. R.

5

> Civ. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Id.*

Salter v. Continental Cas. Co., 132 Fed. Appx. 337, 339 (11th Cir. 2005).


III.

As a threshold matter, the court must address the applicable standard of review in this case. ERISA provides no standard for reviewing the decisions of plan administrators. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989); Williams v. Bellsouth Telecommunications, Inc., 373 F.3d 1132 (11th Cir. 2004). Firestone established three standards of review in ERISA actions: (1) *de novo*, applicable where the plan does not grant the administrator discretion; (2) arbitrary and capricious, applicable where the plan grants the administrator discretion to determine eligibility or construe the terms of the plan, and (3) heightened arbitrary and capricious, applicable where the plan grants the administrator discretion and there is a conflict of interest. See Williams, 373 F.3d at 1134-35 (quoting HCA Health Svcs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001)). In most cases where a company both administers and funds a plan, a conflict of interest arises, thus triggering heightened arbitrary and capricious review. Williams, 373 F.3d at 1135 (citations omitted). Although Firestone addressed this standard for judicial review of an administrator's plan interpretations, courts, including the Eleventh Circuit, apply these three

6

levels of review to both plan interpretations and factual determinations.  Williams, 373 F.3d at

1134 n.3 (citing Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1282 (11th Cir. 2003);

Torres v. Pittston Co., 346 F.3d 1324 (11th Cir. 2003)).

The Eleventh Circuit has establish a multi-step approach for the judicial review of

virtually all ERISA-plan benefit denials using these standards:  (1) Apply the *de*

*novo* standard to determine whether the claim administrator's benefits-denial decision is

"wrong," i.e., the court disagrees with the administrator's decision.  If the decision is not

"wrong," then the court ends the inquiry and affirms the decision.  (2) If the administrator's

decision is *"de novo* wrong," then the court determines whether the administrator was vested

with discretion in reviewing claims.  If not, the court ends the inquiry and reverses the

decision.  (3) If the administrator's decision is *"de novo* wrong" and the administrator was

vested with discretion in reviewing claims, then the court determines whether "reasonable"

grounds supported the decision, i.e., the court reviews the decision under the more deferential

arbitrary and capricious standard.  (4) If no reasonable grounds exist, then the court ends the

inquiry and reverses the administrator's decision.  If reasonable grounds exist, then the court

determines if the administrator operated under a conflict of interest.  (5) If there is no conflict,

then the court ends the inquiry and affirms the decision.  (6) If there is a conflict of interest,

then the court applies the heightened arbitrary and capricious standard of review and either

affirms or reverses the decision.  See Williams, 373 F.3d at 1138 (following HCA, 240 F.3d at

993-94).  At this step, the Eleventh Circuit has incorporated a two-step, burden shifting

approach:  (1) The claimant shows that the administrator of a discretion-vesting plan is

conflicted.  (2) The burden then shifts to the administrator to prove that his plan interpretation

was not tainted by self-interest.  Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556,

7

1566 (11th Cir. 1990).  A "wrong" but "reasonable" interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant.  See id. at 1566-67.  It is not arbitrary and capricious if the fiduciary justifies its interpretation on the ground of its benefit to the class of all participants and beneficiaries.  Id. at 1567.  This standard applies both to the interpretation of the policy language and factual determinations.  Torres, 346 F.3d at 1332.

It is undisputed that MetLife, as plan insurer, was vested with discretion in interpreting the plan and in reviewing claims.  See SPD (Doc. 20-4 at 4); see also (Doc. 25 at 15-16; Doc. 27 at 15; Doc. 28 at 7).  As a result, the heightened arbitrary and capricious standard applies to the court's review.[3]  Brown, 898 F.2d at 1570.

---

[3]MetLife cites to Williams v. Bellsouth Telecommunications, Inc., 373 F.3d 1132, 1138-39 (11th Cir. 2004), in support of its argument that an unmodified arbitrary and capricious standard applies in this case.  The court respectfully disagrees with MetLife's reading of Williams.  The Eleventh Circuit was explicit in its discussion of the applicable standards of review:

> Finally, where the administrator has discretion but exercises it under a conflict of interest, we apply "heightened arbitrary and capricious" review. There we apply a level of deference (and conversely, scrutiny) somewhere between what is applied under the de novo and "regular" arbitrary and capricious standards.

Id. at 1137.  MetLife's quotation of the discussion of Shaw v. Connecticut General Life Ins. Co., 353 F.3d 1276 (11th Cir. 2003), and Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321 (11th Cir. 2001), is taken out of context.  The court in Williams continued to explain that in Levinson, the court had no need to apply the heightened arbitrary and capricious standard because it found the administrator's decision wrong and without a reasonable basis, and thus, the decision would not have survived the more judicially deferential "arbitrary and capricious" standard.  See Williams, 373 F.3d at 1139.  Likewise, the court in Shaw found that the appropriate standard of review was the de novo standard where the plan itself did not grant the administrator discretionary authority and the SPD did not properly amend the plan to convey the administrator with discretionary authority.  See Shaw, 353 F.3d at 1283-84.

8

A.

This case presents issues of both plan interpretation and factual determination.  In conducting the initial *de novo* determination of the correctness of MetLife's decisions in this regard, the court is limited to reviewing the administrative record.[4]  With respect to MetLife's interpretation of the soft tissue limitation, for the reasons that follow, I conclude that MetLife's decision was correct.

In making this threshold determination of correctness, the court must consider whether Plaintiff has proposed a reasonable alternative interpretation of the plan, "one that can rival [MetLife's] interpretation."  See Mordecai v. Standard Ins. Co., No. 04-14852, 2005 WL 2249896, at *2 (11th Cir. 2005) (citing Brown, 898 F.2d at1570); Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1550 (11th Cir. 1994).  Before addressing the Plaintiff's interpretation, a brief discussion of the administrative record and the Plan may be useful.

Here, the administrative record consists of The Home Depot 2001 Benefits Summary For Hourly Associates[5] (hereinafter "summary plan description" or "SPD") (Doc. 20, Ex. A

---

[4]When the Court makes the initial determination regarding whether Defendant's decision was wrong, it is a *de novo* review in the sense that the Court reviews the denial of Plaintiff's claim based on the administrative record without deference or any presumption of correctness.  As such, the term, *de novo,* when used to refer to the Court's initial review under the heightened arbitrary and capricious standard, does not mean exactly the same thing as when the term is used to describe one of the three ERISA standards of review.  See Parness v. Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2003).  When used to describe one of the three ERISA standards of review, the term *de novo* denotes that the court is not limited to reviewing the administrative record (and such review is done without deference or any presumption of correctness).  See id.  However, when the court makes the initial determination regarding whether Defendant's decision was wrong under the heightened arbitrary and capricious standard of review, the court is limited to reviewing the administrative record.  See Fick v. Metro. Life Ins. Co., 347 F. Supp.2d 1271, 1280 (S.D. Fla. 2004) (citation omitted).

[5]Plaintiff attached a copy of the 2004 Benefits Summary to her Complaint, see (Docs. 1-2, 1-3), but this document was not in effect at the time of Plaintiff's claim.

9

(Doc. 20-2 through 20-4)); the document entitled "Your Employee Benefit Plan" Home Depot

U.S.A., Inc. Hourly Associates 1/1/97 Revision (hereinafter "Benefit Plan") (Doc. 20, Ex. B

(Doc. 20-5 through 20-6)); and medical reports, test results, and consultative evaluations

considered by MetLife in making its decisions on Plaintiff's claim and appeal together with

documentation of MetLife's actions (Doc. 20, Ex. C (Docs. 20-7 through 20-8, 21, 22, 23,

24)). See MetLife's Aff. at ¶¶ 3-4, 6-7 (Docs. 20-1, 21-1, 22-1, 23-1, 24-1).

       The Plan documents, consisting of the Benefit Plan and the SPD, see id. at ¶¶ 3-4,

provide for the payment to participating employees of a monthly long-term disability benefit

with certain exclusions and with limitations on benefits where disability is due to certain

specified conditions.  In pertinent part, it provides a "Limitation for Disability Due to . . . Soft

Tissue Disorder" as follows:

> You are covered for 24 months of Disability . . . during your
> lifetime if you are Disabled due to
>
> 2.  A soft tissue disorder including, but not limited to, any disease or
>     disorder of the spine or extremities and their surrounding soft
>     tissue; including sprains and strains of joints and adjacent
>     muscles, unless the Disability has objective evidence of: . . .
>     
>     c.  Radiculopathies;
>     d.  Myelopathies; . . .

Benefit Plan at 19-20 (Doc. 20-6 at 3-4).  The Benefit Plan defines these terms as follows:

> "Radiculopathies" means disease of the peripheral nerve roots
> supported by objective clinical findings of nerve pathology.
>
> "Myelopathies" means disease of the spinal cord supported by
> objective clinical findings of spinal cord pathology.

Benefit Plan at 16-17 (Doc. 20-6 at 4-5).

       In pertinent part, the SPD notes exceptions to the maximum period of disability that

the Plan will consider:

10

> The maximum period of disability that the Plan will consider for disability due to . . . soft tissue disorders will be 24 months from the date the disability starts. . . . The period of disability is not limited to 24 months for a disability resulting from . . . radiculopathies [or] myelopathies . . . Soft tissue disorders are conditions which include disorders of the spine or limbs and their surrounding muscles, tendons, ligaments, and other soft tissue (included are sprains and strains of joints and adjacent muscles).

SPD at 75 (Doc. 20-2 at 14).[6]

MetLife interprets the Plan to limit Plaintiff's long-term disability benefits to a term of twenty-four months given the nature of her medical condition, a condition it finds to be squarely within the limitation for soft tissue disorders. In accordance with its reading of the plan, none of the enumerated exceptions to this limitation applied in the absence of objective evidence. By her motion for summary judgment, Plaintiff argues that MetLife's plan interpretation was wrong. In particular, Plaintiff argues that the limitation for soft tissue disorders is ambiguous and, when fairly read, does not apply to her condition. Under the rule of *contra proferentum*, she urges the court to construe the limitation against MetLife and in her favor so as not to apply to her condition.[7] She further argues that, even if MetLife's

---

[6]Section 102 of ERISA requires employers to furnish a summary plan description of any benefit plan to participants and beneficiaries. 29 U.S.C. § 1022(a). The Act requires the SPD to "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." Id.

[7]In support of her contention that the soft tissue disorder limitation is ambiguous, Plaintiff argues that the language describing this limitation should be parsed into three sections: disorders of the "spine"; the "surrounding muscles, tendons, ligaments"; and other soft tissue disorders defined as "sprains and strains of joints and adjacent muscles." See (Doc. 16 at 4-5). As to the term, "spine," Plaintiff cites to websites that define the term as the hard, bony tissue or vertebrae of the back. By her argument, "spine" does not include the intervertebral discs, spinal cord, and nerve roots emanating from the spinal cord, and thus, her disc herniation and accompanying cord and nerve root compression do not fall within the

interpretation of the soft tissue disorder limitation is correct, one or more of the exceptions to the limitation would also apply as demonstrated by her medical record.  By its response and cross-motion for summary judgment, MetLife denies that the Plan language is ambiguous and again asserts that it was applied properly to Plaintiff's claim given her failure to demonstrate an exception to the limitation with objective evidence.[8]

Because ERISA is silent on matters of contract interpretation, the courts follow federal common law for guidance.  Dixon v. Life Ins. Co. of North Am., 389 F.3d 1179, 1183 (11th Cir. 2004); Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1041 (11th Cir. 1998).  The ordinary rules of contract construction require the court first to assess the natural or plain meaning of the policy language, striving to give meaning to every provision.  Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1382 (11th Cir. 1993)[9] (citing

---

definition of a "spine" disorder.  Plaintiff next argues that her condition obviously does not involve the "surrounding muscles, tendons, ligaments."  As for the "other soft tissue" clause, she urges that it too is inapplicable given its self-limiting definition to include "sprains and strains of joints and adjacent muscles."  Citing to the rule of *contra proferentum*, i.e., that a contract ambiguity is construed against the drafter, see Jones v. Am. Gen. Life and Acc. Ins. Co., 370 F.3d 1065, 1070 (11th Cir. 2004) (citing Lee,10 F.3d at 1551), Plaintiff argues that her interpretation of the ambiguous "soft tissue disorder" limitation must prevail, and by this interpretation, the limitation is inapplicable.

[8]MetLife argues that Plaintiff has failed to show a genuine inconsistency, uncertainty, or ambiguity in the soft tissue disorder limitation.  It insists that when the terms are construed in their entirety, there is no ambiguity, and Plaintiffs should not be permitted to create one by so parsing the terms into distinct sections.

[9]Although this case was a non-ERISA case in which the Eleventh Circuit applied Florida law in construing an insurance contract, it is instructional in summarizing the law of ambiguity in contract interpretation.  See Horton, 141 F.3d 1038, 1041 (11th Cir. 1998) ("When crafting a body of common law, federal courts may look to state law as a model because of the states' greater experience in interpreting insurance contracts and resolving coverage disputes.").  In discussing contract ambiguity, other federal courts have cited to Dahl-Eimers in ERISA cases.  See, e.g., Luton v. Prudential Ins. Co. of Am., 88 F. Supp. 2d 1364, 1371 (S.D. Fla. 2000); Murphy v. Ga. Power Co., 54 F. Supp. 2d 1354, 1368 (S.D. Ga.

Landress Auto Wrecking Co., Inc. v. U.S. Fidelity & Guaranty Co., 696 F.2d 1290, 1292

(11th Cir. 1983)).  "An insurance contract is ambiguous if it is susceptible to two or more

reasonable interpretations that can fairly be made. . . . When one of these interpretations

results in coverage and another results in exclusion, ambiguity exists in the insurance policy."

Dahl-Eimers, 986 F.2d at 1381 (citations omitted); see also Lee, 10 F.3d at 1549-51.  For the

existence of an ambiguity, however, there must be "a genuine inconsistency, uncertainty, or

ambiguity in meaning that remains after the court applies the ordinary rules of construction.

Dahl-Eimers, 986 F.2d at 1381 (quoting Excelsior Ins. Co. v. Pomona Park Bar & Package

Store, 369 So. 2d 938, 942 (Fla. 1979)).  Additionally, an ambiguity does not necessarily exist

because a contract requires interpretation or a contract fails to define a term.  Dahl-Eimers,

986 F.2d at 1382 (citations omitted).

      Upon my reading of the Plan documents, there is no ambiguity, and MetLife

correctly determined that Plaintiff's condition fell within the terms of the soft tissue disorder

limitation.  While there are slight differences between the benefit Plan and the SPD in the

wording of the soft tissue limitation, when the terms are read in full, there is no such

ambiguity that would call for a conclusion that the soft tissue limitation does not apply to the

Plaintiff's condition.[10]  Since Plaintiff offers no contrary reading of the Plan apart from the

---

1999); Harrison v. Aetna Life Ins. Co., 925 F. Supp. 744, 748 (M.D. Fla. 1996); Variety
Children's Hosp., Inc. v. Blue Cross/Blue Shield of Fla., 942 F. Supp. 562, 570 (S.D. Fla.
1996).

      [10]There appear minor differences between the Plan documents.  For instance, the
Benefit Plan defines the limitation to include "any disease or disorder of the spine " and
"surrounding soft tissue" while the SPD describes "conditions which include disorders of the
spine " and their "surrounding . . . soft tissues."  To the extent that "disease" and "disorder"
reflect different meanings, the Benefit Plan might appear broader in scope.  However, such
differences do nothing to support Plaintiff's argument that there is an ambiguity over

limitation's inapplicability, I conclude she has failed to offer a plausible or reasonable

alternative interpretation to MetLife's interpretation.

MetLife's motion and Plaintiff's response thereto raises another issue of plan

interpretation that should be addressed briefly.  As indicated above, MetLife urges that the

plain language of the Plan requires a claimant such as Plaintiff to prove an exception to the

plan limitations with objective clinical evidence.  While Plaintiff urges that she offered such

proof in support of her claim, in her response to MetLife's motion, she urges that a conflict

between the Plan document and the SPD requires that the "less restrictive SPD provision [that

does not expressly require objective proof] should govern and that the Plaintiff need only

proffer evidence of subjective complaints of pain."  (Doc. 28 at 6).

By the terms of the Benefit Plan, the limitation on long-term disability benefits for

soft tissue disorders is twenty-four months "*unless* the Disability has *objective evidence* of . . .

Radiculopathies [or] Myelopathies."  Plan at 15-16 (Doc. 20-6 at 3-4) (emphasis added).  The

Benefit Plan continues to define this terms with specificity as set forth above.  In contrast, the

SPD states the exceptions as follows:  "The period of disability is not limited to 24 months for

a disability resulting from . . .  radiculopathies [or] myelopathies."  SPD at 75 (Doc. 20-2 at

14).  However, the SPD does not by its terms require the exceptions to be supported by

objective evidence or objective clinical findings, nor are the conditions defined.

---

coverage of her injury.  I believe the language of the limitation under either Plan document is
read fairly and reasonably to include injury to the intervertebral disks as soft tissue of the
spine.  I find it entirely inappropriate to parse the language of the limitation in the manor
proposed by the Plaintiff to suggest that the limitation does not apply.

In urging that its decision was correct because the Benefit Plan's definitions of terms govern interpretation of the coverage, MetLife cites to introductory language contained in the SPD:

> The purpose of this book, called the Summary Plan Description (SPD) is to describe and explain benefit plans available to associates working in the United States of America.  The SPD is intended only to help you understand the benefit plans available to you and can in no way modify the actual terms and provisions as specified in the legal documents that define the benefit plans.  If there are differences between the information contained in the SPD and the provisions of the legal documents, the legal documents always govern.  Legal documents include the Plan document, trust agreements, and insurance contracts.

SPD at intro. (Doc. 20-2 at 3).  It contends that this provision dictates that the terms of the Benefit Plan control, and by its terms objective proof of the exceptions are required.

To the extent that "differences" between the SPD and the Plan reveal actual conflicts, MetLife's assertion that the Benefit Plan prevails by reason of this provision is unavailing.  See McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir. 1985).  "Such an assertion defeats the purpose of the summary.  It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan."  Id.  ERISA provides that the summary shall be an accurate and comprehensive document that reasonably apprises the employees of their rights under the plan.  See 29 U.S.C. § 1022(a); McKnight, 758 F.2d at 1570.  In this circuit, if there is an inconsistency between the plan and its summary, the summary's interpretation controls.  Kamlet v. Hartford Life & Accident Life Ins. Co., No. 04-11532, 2005 WL 1635297, at *1 (11th Cir. 2005).  However, specific

15

language in one plan document and silence in another does not create a conflict between the

documents.  <u>Curran</u>, 2005 WL 894840, at *4.

> Because of the importance of disclosure to the [ERISA]
> statutory regime, an SPD provision prevails if it conflicts
> with a provision of a plan. . . . However, this rule of
> construction does not apply when the plan document is
> specific and the SPD is silent on a particular matter.
> "While clear and unambiguous *statements* in the summary
> plan description are binding, the same is not true of
> silence."

<u>Jensen v. SIPCO, Inc.</u>, 38 F.3d 945, 952 (8th Cir. 1994)  (emphasis in original) (citations

omitted), *cited in* <u>Curran</u>, 2005 WL 894840, at *4.

By the plain language of both documents, a claimant is required to prove one of six

specified exceptions to the limitations on long-term benefits if she seeks a continuation of

benefits.  While the SPD may be silent as to the nature of such proof required, its terms are

not inconsistent with the terms of the Benefit Plan.  <u>See Curran</u>, 2005 WL 894840, at *4.  This

conclusion is further supported by court decisions which have rejected a suggestion, such as

Plaintiff here makes, that the SPD allows for mere subjective complaints to suffice as proof of

a medical condition/exception.  Thus, courts have found it reasonable for a plan administrator

to require objective medical evidence even where a plan does not contain an express

requirement of objective evidence in order to assure that the claims process is meaningful.

<u>See Hufford v. Harris Corp.</u>, 322 F. Supp. 2d 1345, 1356 (M.D. Fla.2004); <u>Fick</u>, 347 F. Supp.

2d at 1286.  Plaintiff's interpretation of the Plan documents to allow for mere subjective

complaints to suffice as proof of a medical exception is not reasonable.  Accordingly, while I

disagree with MetLife's rationale as to why the Benefit Plan language controls and thus why

16

objective evidence of an exception is required, I find that MetLife correctly interpreted the Plan as it pertains to the soft tissue disorder limitation and the exceptions thereunder.

### B.

Plaintiff also contends that even if the limitation for soft tissue disorders applies, MetLife's decision is factually incorrect because she offered medical proof, including objective medical proof, of the exceptions for radiculopathies or myelopathies.  Therefore, by her argument, the exception to the limitation applies, and she was entitled to continued long-term disability benefits.[11]  In support of her claim of radiculopathy, Plaintiff points to the MRIs, a positive Spurling's test, and the findings of various of her treating doctors.  She urges that the report of Dr. William R. Greenberg, who reviewed an MRI to reveal "a disk protrusion indenting the thecal sac indenting the spinal cord," (Doc. 22-3 at 2), supports the exception for myelopathy as well.  By its response and cross-motion for summary judgment, MetLife argues that these exceptions do not apply because Plaintiff's medical records are devoid of objective evidence of such exceptions as required by the Benefit Plan.

Plaintiff's medical record presents mixed findings concerning her complaints of cervical radiculopathy.  The following is a summary of the relevant records:

• An MRI report dated December 18, 2001, indicated: "Patient presents with chief complaints of neck pain with radicular symptoms affecting the upper extremities." (Doc. 20-7 at 2).  The findings and impressions of the radiologist were as follows: "The cervical cord is intrinsically normal as viewed without contrast. . . . Prominent right paracentral disc protrusion (herniation) C5-6 with mass effect on the ventral dura and ventral cord compression.  There appears to be minimal neural foraminal stenosis on the right at this level.  Mild central anular bulge C4-5 effacing the ventral

---

[11]Plaintiff looks to case law or medical dictionaries to define radiculopathy as "a disease of the nerve roots," "the irritation of a nerve root at any level of the spine," and as "a disease involving a spinal nerve root."  (Doc. 16-1 at 6).  She defines myelopathy as "a disturbance or disease of the spinal cord."  Id. at 8.

dura. . . . Small central disc protrusion (herniation) C7-T1 with mass effect on the ventral dura and no ventral cord compression. . . .  Marrow signals are within the range of normal.  Hypolordosis is prominent.  This may be compatible with some degree of muscle spasm with clinical correlation."  Id.

•   Chiropractic records between December 2001 and January 2002 reveal subjective complaints of pain and headaches and occasional complaints of neck and shoulder spasm and tingling in shoulders and arm.  See (Docs. 20-7 at 3-37, 20-8 at 1-3).

•   An ICD-9CM diagnostic code sheet has marked "Cervical Radiculitis" as a condition.[12]  See (Doc. 20-7 at 32).

•   On  February 26, 2002, Dr. James D. Shortt, an orthopaedic surgeon, conducted a physical examination of Plaintiff and assessed her with cervical disc protrusion C5-6, greater than C4-5, and C7 to T1, cervical myofascial strain, with hypertonicity, lumbar myofascial strain, and left lumbar radiculopathy.  See (Doc. 20-8 at 11).

•   On March 13, 2002, Dr. Shortt conducted another physical examination of Plaintiff and found reduced range of motion in the cervical and lumbar spines but "no symptoms of radiculopathy." (Doc. 20-8 at 9).

•   On March 20, 2002, Dr. Gomes, a Board Certified Neurological Surgeon,  examined Plaintiff and assessed her as "Status post severe stress injury to the cervical spine . . . Post-traumatic cervical sprain/strain/myofascial pain syndrome . . . Post-traumatic lumbar strain . . . Herniated cervical disc at C5-6, Cervical disc protrusion at C7-T1. (Doc. 20-8 at 12-13).  The doctor noted:  "The patient has sustained significant injuries primarily to the cervical spine with a resulting herniated cervical disc at C5-6.  Symptoms and signs are consistent with the findings on the MRI scan."  Id.  As to the neurological exam conducted on the Plaintiff, the doctor stated: "The patient is alert and oriented to place, time, and person.  Gait is normal.  The muscle bulk shows no atrophy in the muscle groups in the upper and lower extremities.  Motor function is 5/5 in the upper and lower extremities.  Grip strength is normal.  Deep tendon reflexes are 2+ and symmetrical.  Sensory modalities are normal."  Id.

•   On April 3, 2002, Dr. Thomas Tolli, M.D., conducted a physical examination of Plaintiff.  He noted no spasm upon his examination of her cervical upper extremities.  A Spurling's test[13] produced right and left arm pain and he noted "pain radiates to the

---

[12]This document is undated.  Based on the exhibits immediately before and after this document in the record, however, it appears to have been generated in December 2001 or January 2002.

[13]The website of the University of Florida's College of Medicine Center for Musculoskeletal Pain Research describes the Spurling sign as a "test used for the evaluation of cervical spine radiculopathy."  http://www.med.ufl.edu/rheum/rheumTests. htm#spurling. The site explains the testing procedure as follows: "The patient laterally bends the neck to

shoulder and posterior arm."  (Doc. 23-6 at 2).  In his summary, he stated "[she] does have positive Spurling's test on the left that reproduces left shoulder pain and posterior arm pain."  Id. at 3. He called for additional nerve conduction studies of Plaintiff's upper extremities, but the record suggests none were performed.  Id.

- On July 17, 2002, Dr. Gomes examined Plaintiff and noted:  "I have explained to [Plaintiff] that she has a permanent injury and a sizable herniation at C5-6 and within a reasonable degree of medical probability she is going to require a discectomy and fusion, Smith-Robinson technique, at C5-6 with an estimated cost in the range of twenty-five to thirty thousand dollars.  Alternative treatments would be epidural cervical blocks and trigger point injections with an estimated cost in the range of five thousand dollars on a yearly basis indefinitely.  She is not able to return to work at this time.  See (Doc. 22-10 at 1).

- By a letter to Dr. Edward Martinez dated September 11, 2002, Dr. Robert C. Nucci, a Board Certified Orthopedic Spine Surgeon, noted his impression that Plaintiff's "[c]entral disk herniation at C5/6 with significant compression of the spinal cord . . . is a permanent injury with neck and left radicular arm pain and electric shocks down her left arm."  (Doc. 21-4 at 1).

- On September 24, 2002, Dr. Nucci conducted a surgical consultation and noted Plaintiff's complaints of "intractable neck and left radicular arm pain in a C6 nerve root distribution."  (Doc. 21-4 at 3).

- On October 14, 2002, Dr. William Greenberg, a neurologist, conducted a neurological examination and review of Plaintiff's medical records.  His finding were essentially normal except he noted restriction in her neck range of motion for extension and complaints of discomfort.  He reported: "Clinically, she does not have objective abnormalities to correlate with the significant abnormalities seen on the cervical MRI.  There is no objective evidence for myelopathy or radiculopathy. . . ." (Doc. 22-3 at 1-2).

- In Attending Physician's Statements of Functional Capacity dated November 7, 2002, January 28, 2003, Dr. Gomes listed cervical radiculopathy as a diagnosis secondary to herniated cervical disc.  See (Docs. 21-5 at 1; 24-6 at 2).

- An MRI conducted on October 17, 2003, revealed a disc herniation at C5-6 and resulting "moderate central canal stenosis and prominent right foraminal stenosis." (Doc. 23-5 at 1-2).

---

each side while maintaining a posture of cervical extension. Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy. Pain with contralateral bending suggests a musculo-ligamentous origin."  Id.

In her appeal letter to MetLife (Doc. 23-4 at 3-4) and before this court, Plaintiff cites to several references to and indications of radiculopathy within the administrative record.  In particular, Plaintiff cites to Dr. Shortt's assessment of left lumbar radiculopathy on February 26, 2002, see (Doc. 20-8 at 11); Dr. Tolli's examination and positive Spurling's test on April 3, 2002, see (Doc. 23-6 at 3); Dr. Nucci's letter of September 11, 2002, noting Plaintiff's radicular arm pain, see (Doc. 21-4 at 1); Dr. Gomes's listing of cervical radiculopathy as a diagnosis secondary to herniated cervical disc in his Attending Physician's Statements of Functional Capacity dated November 7, 2002, and January 28, 2003, see (Docs. 21-5 at 1; 24-6 at 2); the October 17, 2003, MRI that revealed a disc herniation at C5-6 and resulting "moderate central canal stenosis and bilateral foraminal stenosis"; and notes from Dr. Eduardo Martinez, M.D., from October and November 2003 which assessed Plaintiff with cervical radiculopathy.  See (Docs. 23-8 at 3, 23-9 at 1-2).  Additionally, Plaintiff cites to other references to radicular pain.[14]

In response to Plaintiff's argument that she suffers from radiculopathies and/or myelopathies that exclude her from the soft tissue disorder limitation, MetLife first argues that none of the evidence cited by Plaintiff constitutes objective evidence of the condition(s).  While MetLife acknowledges Plaintiff's subjective complaints of radicular symptoms, MetLife cites to contradictory evidence in the record that indicate that Plaintiff did not suffer from radiculopathy.  With respect to the MRIs, MetLife observes that neither report mentions

---

[14]Specifically, Plaintiff cites to the December 18, 2001, MRI see (Doc. 20-7 at 2); notes of Dr. Gomes, see (Docs. 23-7 at 2; 20-8 at 12; 23-8 at 1, 2); Dr. Nucci's notes of September 24, 2002, see (Doc. 21-4 at 3); the ICD-9CM diagnostic code sheet, see (Doc. 20-7 at 32).

radiculopathy in the radiologists' findings or impressions.  See (Docs. 20-7 at 2; 23-5 at 1-2).

The December 18, 2001, report stated:  "The cervical cord is intrinsically normal as viewed

without contrast. . . . Marrow signals are within the range of normal."  (Doc. 20-7 at 2).  The

October 17, 2003, MRI stated that "[t]here is normal signal intensity in the spinal cord."

Although Dr. Gomes made the secondary diagnoses of cervical radiculopathy in his Attending

Physician's Statements of Functional Capacity dated November 7, 2002, and January 28,

2003, Dr. Gomes last saw or treated Plaintiff in July 17, 2002.  See (Docs. 21-5 at 1; 24-6 at

2).  Moreover, these statements were inconsistent with his examination report dated March

20, 2002, which reflected an unremarkable neurological exam and which made no mention of

radiculopathy in his assessment.  See (Doc. 20-8 at 12-13).  Less than a month after assessing

Plaintiff with left lumbar radiculopathy, see (Doc. 20-8 at 11), Dr. Shortt conducted a physical

examination of Plaintiff on March 13, 2003, and found "no symptoms of radiculopathy."

(Doc. 20-8 at 9).  Dr. Greenberg, who conducted a neurological examination and review of

Plaintiff's medical records on October 14, 2002, found "no objective evidence for . . .

radiculopathy. (Doc. 22-3 at 2).  MetLife also points out that Plaintiff's general practitioner,

Dr. Martinez, made no mention of radiculopathy in his records prior to MetLife's decision.

See (Docs. 21-8 at 1; 21-9 at 2; 22-8 at 1).  However, as Plaintiff advised MetLife, at about

the time MetLife determined to terminate benefits, Martinez did assess cervical radiculopathy.

    In further support of its factual determination, MetLife cites to the opinion of an

independent physician consultant, Dr. Robert Menotti, who conducted a review of Plaintiff's

medical records and concluded that they lacked any objective evidence of myelopathy or

radiculopathy.  See (Doc. 24-5 at 16).  Additionally, it cites the report of Dr. Tolli (Doc. 23-7

21

at 1), and contends that appropriate objective tests would include a myelogram, CT scan of the cervical spine, electromyogram, and/or nerve conduction studies, see (Doc. 27 at 12), none of which are in the record.  For unexplained reasons, MetLife does not address Dr. Tolli's positive Spurling's test that indicated radiculopathy.

While I recognize that the medical record before MetLife offered a mixed picture as it relates to whether Plaintiff's condition included cervical radiculopathy, upon my *de novo* review, I conclude that MetLife was wrong in its factual determination that the record was without objective support to Plaintiff's claim of cervical radiculopathy.[15]  Accordingly, I find that MetLife's decision was "wrong."

## C.

Because it is undisputed that MetLife was vested with discretion in reviewing claims and because the administrator's decision is *de novo* "wrong," the court next determines whether "reasonable" grounds supported the decision.  Because I have found that the Plaintiff has proposed a sound contrary factual determination under the Plan, the issue is whether the Defendant was arbitrary and capricious in adopting a different interpretation.  See Lee, 10 F.3d at 1550 (citing Brown, 898 F.2d at 1570).

Given the medical record before it, I further find that MetLife's interpretation of the plan was reasonable.[16]

---

[15]As to her claim of myelopathy, even assuming it was properly raised with Metlife, I cannot find that the report of Dr. Greenberg constitutes sufficient objective evidence to satisfy that exclusion to the limitation for soft tissue disorders.

[16]In particular, the court notes that although the conclusions of Dr. Greenberg and Dr. Menotti differed from the opinions of some of Plaintiff's treating physicians, MetLife was not obligated to accord special deference to the opinions of Plaintiff's treating physicians.

D.

The court must next determine whether MetLife operated under a conflict of interest and then whether MetLife's decision was arbitrary and capricious because it advanced MetLife's conflicting interest at the expense of the participant. Lee,10 F.3d at 1550. The burden is on the claims administrator to show the decision was not tainted by self-interest. Potter, 132 Fed. Appx. at 257 (citing Brown, 898 F.2d at 1566-67). The administrator may meet this burden by demonstrating that its interpretation of the plan benefitted the class of all participants and beneficiaries." Lee, 10 F.3d at 550 (11th Cir. 1994) (citing Brown, 898 F.2d at 1566-67). "An improper motive sufficient to set aside a fiduciary's decision may be inferred from the fiduciary's failure to investigate or to interpret honestly evidence that greatly preponderates in one direction." Brown, 898 F.2d at 1566, n.11.

As noted above, the Plan conveys MetLife discretionary authority to administer claims and that MetLife was the insurer of the Plan. As both the claims administrator and the insurer MetLife operated under a conflict of interest, and the heightened arbitrary and capricious standard applies.

MetLife argues generally that its decision benefits the class of participants and beneficiaries because the cost of the long-term disability insurance increases if benefits are paid to employees who fail to satisfy plan terms. MetLife rephrases this argument to suggest that the payment of disability benefits to employees who do not meet plan requirements

---

"Nothing in the Act . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003); Langford v. UNUM Life Ins. Co. of Am., 138 Fed. Appx. 162, 165 (11th Cir. 2005).

23

constitutes a subsidy of "early retirement under the guise of disability." <u>See</u> (Doc. 25 at 19). This argument, however, is premised on the assumption that Plaintiff is seeking disability benefits without meeting Plan requirements.  While MetLife's application of the exceptions and its factual determination under the limitation for soft tissue disorders may translate into cost-savings for MetLife and the employer, there is no demonstration that its factual determination in these circumstances benefits any class of participants.  Here, instead of crediting those portions of the medical record indicating the claimant met Plan requirements, it chose instead to rely on those portions that, under its interpretation, did not.  Such method for concluding a benefit termination is not only unfair to the injured claimant but serves to underscore the conflict under which MetLife operates.[17]  Additionally, any suggestion that a denial of benefits translates to a cost savings to other covered employees and the employer is unpersuasive as such cost savings may be realized by each and every denial by the

---

[17]It seems reasonable to me that treating doctors generally do not construct their office notes with an eye toward the particulars of a given insurance plan nor do they document ever procedure they may employ during an office visit which supports their assessments or diagnoses.  Thus, perceptions of "gaps" or "inconsistencies"in treatment notes must nearly always appear and reliance on such may lead to incorrect conclusions entirely.  Here, Plaintiff was treated by highly qualified doctors, some of whom found evidence of cervical radiculopathy.  I find it unreasonable that MetLife appears to have assumed that the assessments of cervical radiculopathy made after examination were not objectively based even if not backed up by EMGs or nerve conduction studies.  If such studies were what was required to perfect a claim for continued benefits, then the Plan should have clearly indicated so.  While MetLife found the record inconsistent and lacking in objective proof, there was objective evidence of a significant disk herniation and objective evidence, even if minimal, of radiculopathy.  In these circumstances, MetLife's determination wrongly served to advance its interest at the expense of the Plaintiff's.  The interests of Plan participants as a class is not advanced in these circumstances.  My conclusion in no way speaks to whether Plaintiff was actually disabled -- only that she met the requirements of the Plan with respect to the soft tissue disorder limitation and its exceptions and that her benefits should not have been terminated.

administrator, regardless of the validity of the claim or the bad faith or conflict of interest by the administrator.  Under these circumstances, where MetLife's "wrong" but "reasonable" interpretation advanced its conflicting interest at the expense of Plaintiff, the court recommends a finding that MetLife's decision to terminate Plaintiff's benefits under the limitation for soft tissue disorders is arbitrary and capricious.

IV.

For the foregoing reasons, it is RECOMMENDED that the court GRANT in part Plaintiff's Motion for Summary Judgment (Doc. 16) by finding that her long-term disability benefits were wrongfully terminated and directing by its judgment that she be reinstated in the Plan and awarded past due benefits from the date benefits were terminated.  The court should retain jurisdiction of the case to resolve any disputes over the amount of benefits owed and the award of fees and costs, if any, that may be appropriate in this case.  It is FURTHER RECOMMENDED that the court DENY Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law (Doc. 25).

Respectfully submitted on this
17th day of November 2005.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

25

**<u>NOTICE TO PARTIES</u>**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; <u>see also</u> Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable Steven D. Merryday, United States District Judge
Counsel of Record